USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:_____
DATE FILED: 11/14/2012

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X

ADNAN ASAN,

                          Petitioner,                          No. 11 Civ. 5370 (CSH)

          -against-                                    **OPINION AND ORDER**

  UNITED STATES OF AMERICA,

                          Respondent.

-------------------------------------------------------------------X

**HAIGHT, Senior District Judge:**

          Petitioner Adnan Asan was convicted of a narcotics offense in this Court on his plea of guilty

in 1984.   In 2007 the United States Department of Homeland Security, acting through the

Immigration and Customs Enforcement agency ("ICE"), deported Asan to his native country of

Macedonia, where Asan currently resides.  In 2011 Asan filed this *coram nobis* petition.  He alleges

that the assistance rendered to him by his attorney at the time of his guilty plea was ineffective to a

degree that violated the United States Constitution.  By this petition, Asan prays the Court to vacate

his guilty plea, thereby paving the way for a return to the United States.  The Government resists

Asan's petition in all respects.

          In a series of prior opinions and rulings, familiarity with which is assumed, the Court held

that an evidentiary hearing was required.  That hearing took place in the Courthouse on May 14 and

May 15, 2012.  Counsel for the Petitioner were Raymond G. Lahoud and Daniel Baurkot.  Counsel

for the Government were Assistant United States Attorneys ("AUSAs") Jessica Lonergan and

Michael Levy.  Thereafter, counsel for the parties filed main and reply post-hearing briefs, which

principally addressed the question of whether the assistance given Asan by his attorney at the time

of his plea had been ineffective within the constitutional context.   After careful consideration, the

Court sets forth in this opinion its Findings of Fact and Conclusions of Law.

## I.   BACKGROUND

A.   <u>The Witnesses at the Hearing</u>

Four individuals testified at the May hearing.   The first witness was the petitioner, Adnan

Asan, who testified by closed television hookup from the United States Embassy in Macedonia.[1]

The second witness was Petitioner's wife, Fluturije Asan, who resides in the United States.

Petitioner and his wife were called as witnesses by counsel for the Petitioner, who conducted the

direct examinations, with cross-examination by counsel for the Government.

The Government then called the third witness, Jed S. Rakoff, who at the times pertinent to

the petition was an attorney in private practice and a member of the Court's Criminal Justice Act

panel, assigned in 1983 to represent Adnan Asan in connection with the charges brought against him

by the United States Attorney for this District.[2]   The fourth and last witness, also called by the

Government, was Alan M. Cohen, an attorney who is presently chief compliance officer for the

---

[1]  The successful arrangements for taking Petitioner's testimony in this fashion were made with the essential assistance of the United States Department of State, including the Embassy staff. I take this occasion to express my particular gratitude to Michael Davidson, a Special Agent with the Department of State's diplomatic security service, who attended Petitioner's testimony at the Embassy in Macedonia, and at a crucial moment interceded with government technological forces to ensure that the television hookup facilities remained available during the entirety of the hearing. Mr. Davidson was courteous and efficient and I salute him, from across the ocean and that functional gulf separating the Judicial and Executive Branches of the Government.

[2]  In 1996 Mr. Rakoff was appointed a United States District Judge in this District, a position he still holds.  In order better to reflect the circumstances as they existed during the times pertinent to the petition, I will refer to the witnesses as "Mr." or "Mrs.", as the case may be.

Goldman Sachs Group, and at the pertinent times was an AUSA in this District, in charge of the Government's case against Mr. Asan.  Government counsel conducted the direct examinations of Messrs. Rakoff and Cohen; counsel for Mr. Asan cross-examined them.

In addition to the testimony of these witnesses, a number of documents generated by earlier events were received in evidence.

**B.    The Present Petition for a Writ of Error *Coram Nobis***

This proceeding was initiated on August 2, 2011, when counsel for Mr. Asan filed on his behalf in this Court a petition for a writ of error *coram nobis*.  The petition was assigned to me because, in 1983 and 1984, I had presided over the original criminal case against Mr. Asan, *United States v. Adnan Asan*, No. 84 Cr. 006 (CSH) (S.D.N.Y.) (the "underlying case").  The manner of the underlying case's disposition forms the subject matter of the relief Mr. Asan seeks in this petition.

The Government's underlying case against Mr. Asan was one of several prosecutions of individuals engaged in a major conspiracy involving the shipment of narcotics from eastern Europe into the United States.  Mr. Asan was arrested as a participant in that conspiracy.  He entered into a cooperation agreement with the United States Attorney for this District, pleaded guilty to a lesser charge, testified against a number of major participants in the conspiracy at trials resulting in their convictions, and was sentenced by this Court to three years' probation after the Government advised the Court of the extent and value of Mr. Asan's cooperation.   Mr. Asan, a legal immigrant and holder of a green card, resumed his life in the United States with Mrs. Asan and their children.

In 2007, the Department of Homeland Security, acting through ICE, ordered the deportation of Mr. Asan from the United States to Macedonia.  In an opinion rejecting Mr. Asan's unsuccessful *coram nobis* proceeding at that time, I noted the parties' agreement that Mr. Asan's narcotics

conviction in the underlying case "forms the basis for ICE's order of deportation." 2007 WL 2746898, at *1 (S.D.N.Y. Sept. 17, 2007). Mr. Asan's present *coram nobis* petition is accordingly his second.

The present petition, filed in August 2011, received case number 11 Civ. 5370 (CSH). The petition [Doc. 1] is dated July 25, 2011 and was filed on August 2, 2011. It took the form of a factual recital signed by Mr. Lahoud, counsel for Mr. Asan, accompanied by legal argument with citations to authority, and attached several pertinent documents. The petition's conclusion prayed for an order of the Court vacating Asan's conviction in the underlying case, or in the alternative, an evidentiary hearing.

The petition did not contain or include an affidavit or declaration executed by Mr. Asan himself. It became apparent that the petition's factual assertions were based upon statements Mr. Asan made to his attorney, who then paraphrased or summarized those statements for inclusion in the petition. The Government took the unsurprising position that in those circumstances the petition's factual assertions had to be disregarded entirely, so that the petition merited no response and should be dismissed out of hand. In the alternative, the Government contented itself with a broad and general denial of the accuracy of the petition's factual recitations.

The Court decided to consider the contents of the petition for the limited purpose of determining whether Mr. Asan was entitled to an evidentiary hearing. I did so because I accepted as plausible Mr. Lahoud's representations that Mr. Asan's safety and life were imperiled by the close proximity to him in Macedonia of kingpins in the underlying drug conspiracy, now released from their prison terms in the United States and deported to Macedonia. It is undisputed in this *coram nobis* proceeding that Mr. Asan's testimony against those individuals in this Court, pursuant to his

4

cooperation agreement, played an important role in their convictions, so that they might reasonably be expected to harbor a certain animosity against Mr. Asan. However, I stressed that if an evidentiary hearing was ordered on the basis of the assertions of fact attributed to Mr. Asan in his petition, arrangements would have to be made to take his testimony under oath and subject to cross-examination by the Government. The Court's direction that an evidentiary hearing take place is included in an opinion reported at 2011 U.S. Dist. LEXIS 135989, at *27-32 (S.D.N.Y. Nov. 23, 2011), to which I adhered in several subsequent orders rebuffing governmental efforts to bar a hearing. *See also* the opinion reported at 2011 WL 6880737 (S.D.N.Y. Dec. 30, 2011).

Mr. Asan's petition contained a number of factual assertions, attributed by counsel to him, whose cumulative effect made it plain that the justice of the cause required an evidentiary hearing. I will quote some of those assertions.

Page 4 of the petition recites the undisputed fact that Mr. Asan and the United States Attorney for this District "entered into a cooperation agreement dated November 22, 1983." The petition then asserts at page 4:

> Prior to signing the agreement, Petitioner asked his attorneys about whether or not he could be deported. After consulting with others, including members of the United States Attorney's Office, Petitioner was told that he would not be deported if he pled guilty pursuant to the terms of the agreement. Petitioner asked his then-counsel several times and each time, Petitioner was told "not to worry" and that he will remain in the United States. . . . Relying on the advice of his attorneys with respect to deportation, Petitioner signed the cooperation agreement and began working with the Government.

The petition asserts at page 5:

> In 1984, Petitioner entered a plea of guilty and, given his cooperation, he was sentenced to only three years probation, with no prison term on September 5, 1984. Prior to entering his plea, Petitioner again asked his attorneys at the time about any potential deportation

> consequences and he was reassured that he would not be deported.
> Never did his attorneys inform him that he would face deportation.
> Had he been informed, Petitioner would not have entered into a
> cooperation agreement that would have caused him to be deported
> back to the country that he would be killed [*sic*], given that very same
> cooperation.

The petition concludes its factual recitations by asserting at page 6:

> Petitioner's plea was involuntary, unknowing and unintelligent.  He
> was either misled by his own attorneys or his attorneys had no idea
> that a plea of guilty to the charged crime could render Petitioner
> deportable.  Whatever the case, his attorneys provided him with
> incorrect information.  Petitioner relied on this information, much to
> his disadvantage.

That "disadvantage" manifested itself when in 2007 ICE deported Mr. Asan from the United States

to Macedonia, an adverse action taken as the result of Mr. Asan's guilty plea to the narcotics charge

in 1984.  Mr. Asan's constitutional claim, pressed in this *coram nobis* proceeding, is that at the time

of his plea, he was denied the effective assistance of counsel.

In the Court's November 23, 2011 opinion, I declined "to decide the merits of the case at bar

as a matter of law, in an evidentiary vacuum," and concluded that "there must be an evidentiary

hearing to fully develop the facts, to the extent possible."   2011 U.S. Dist. LEXIS 135989, at *31-

32.  It had become apparent that the key witnesses were Mr. Asan; Mr. Rakoff, the attorney assigned

to represent him; and Mr. Cohen, the AUSA in charge of the prosecution.  In the December 30, 2011

opinion, I had occasion to reflect upon the relevance of those witnesses' testimony to the decisive

issues of fact:

> In the case at bar, the principal facts that are both of consequence and
> in dispute are what Asan asked his trial attorneys with respect to
> whether his cooperation and plea would have any adverse deportation
> effects upon him, and what his attorneys said to Asan in response to
> whatever inquiries he made on that subject.  Asan's petition describes
> those oral exchanges in a narrative  recounted to his present attorney,

6

who then summarized them in the petition.  The government responds that no such conversations took place.  Asan's trial attorneys and the government prosecutors handling the case have personal and direct knowledge of what was said or not said on the subject of deportation consequences.  Their testimony will be relevant and necessary to the just resolution of the case.[3]

According to the present record, Jed S. Rakoff was Asan's princial trial counsel; none other is mentioned. . . . Mr. Rakoff's testimony is necessary for resolution of the core facts in dispute: the existence and substance of any discussion about adverse deportation consequences if Asan cooperated and pleaded.

Former AUSA Alan M. Cohen was the prosecutor.  Cohen signed the November 22, 1983 cooperation agreement on behalf of the government as an "Assistant United States Attorney."  There seems no reason to doubt that Cohen negotiated the plea agreement on behalf of the government, and discussed its terms with Asan and Asan's counsel. . . .

Cohen's testimony is clearly necessary with respect to those core facts in dispute.

2011 WL 6880737, at *1-2.

Messrs. Asan, Rakoff and Cohen all testified and were cross-examined during the May 2012 hearing.  The case turns upon the findings of fact the Court must make upon the basis of that testimony and the accompanying exhibits.  I turn to that subject.

## II.  FINDINGS OF FACT

1.  A time came, during the Government's prosecution of drug charges against Adnan Asan and others, when Jed S. Rakoff was appointed to represent Mr. Asan as his defense counsel.  The

---

[3] The analysis of relevance quoted in text was preceded by a quotation of Fed. R. Evid. 401, which defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  2011 WL 6880737, at *1.

7

record contains a cooperation agreement letter dated November 22, 1983 which is Petitioner's Exhibit 1 (P. Ex. 1) in this hearing. P. Ex. 1, on the letterhead of the United States Attorney, was signed by AUSA Cohen, who was in charge of the case for the Government; signed under the notation "APPROVED:" by Lawrence B. Pedowitz, the Chief of the United States Attorney's Criminal Division; signed under the notation "AGREED AND CONSENTED TO:" by Mr. Asan; and signed under the notation "APPROVED:" by Mr. Rakoff as "Attorney for Adnan Asan."

    2.  P. Ex. 1 was signed by these individuals in the manners described during a meeting in the offices of the United States Attorney on the date recited on the letter: November 22, 1983.

    3.  Mr. Rakoff had served as an Assistant United States Attorney for this District from 1973 to 1980. He worked as a prosecutor in the criminal division of that office, and had experience in signing up defendants or those charged with crime as cooperating witnesses. In 1980, Mr. Rakoff left Government service and joined the private law firm of Mudge Rose Guthrie Alexander & Ferdon. From 1980 and continuously thereafter, Mr. Rakoff, a Mudge Rose partner, practiced as a criminal defense attorney, until his appointment in 1996 as a United States District Judge in this Court.[4]

    4.  In or about 1981, Mr. Rakoff became a member of this Court's Criminal Justice Act ("CJA") panel of defense lawyers. CJA lawyers represent indigent defendants in criminal cases when for any reason the Federal Defenders Service is unable to do so. CJA panel members are assigned particular days to be on call, in the event a need for CJA representation arises. In the case at bar, it came to pass in 1983 that Mr. Asan required legal representation in connection with his

---

   [4] Rakoff, Tr. 151-152. "Tr." throughout this opinion is a reference to the transcript of the May 2012 evidentiary hearing.

proposed cooperation with the Government in the underlying narcotics conspiracy case.  This need

was made known by a Magistrate Judge of the Court, to whom the Government had applied for an

appointment from the CJA panel.  Mr. Rakoff had the CJA duty that day, and so he became Mr.

Asan's attorney: appointed, in Mr. Rakoff's description, "to represent him in negotiating an

agreement and for all other purposes."  Tr. 152.

     5.   The circumstances resulting in Mr. Rakoff's retention described in ¶ 4 of these Findings

are agreed upon in principle by all the individuals concerned.   Mr. Rakoff described his

understanding that Mr. Asan "had already been meeting for some time with the Assistant United

States Attorney, and they were of the view that he was ready to sign a cooperation agreement, so they

asked the Magistrate to appoint whoever was the CJA attorney for that day to represent him in

negotiating an agreement and for all other purposes. And I was the CJA counsel that day, so I got

a call telling me that I was appointed to represent him."  Tr. 152.  Former AUSA Cohen, testifying

on cross-examination by counsel for Asan, expressed "a dim recollection" that "Mr. Asan was

arrested following some, both conversations around and some narcotics transactions with an

undercover agent of the DEA or the DEA task force. . . . At the time of his arrest he was brought in

for a conversation with agents and with me about whether he would actively cooperate with what

was then an ongoing investigation."  Tr. 220-221.  While Mr. Cohen lacked specific recollection of

events occurring "28 years ago," he acknowledged to Asan's counsel that "it's entirely possible that

the meeting I just described to you after he was arrested, at which point we approached him to

actively go back out on the street and cooperate working with the Drug Enforcement Administration

was without counsel." Tr. 221-222. Counsel then asked: "At some point in time CJA counsel was

appointed, correct?" to which Cohen responded: "That is correct."  Tr. 222.

6.   There is some uncertainty as to how often Mr. Rakoff met with Mr. Asan prior to the November 22, 1983 meeting in the United States Attorney's office described in ¶ 1, when the cooperation agreement was executed.   Mr. Asan, asked on direct examination by his counsel to clarify the times that he "met with Mr. Rakoff with respect to the cooperation agreement," recalled that "I was working more with, actually more than more with [*sic*] Mr. Rakoff's assistants, and I believe to my belief that the first time I met with Mr. Rakoff was when the agreement was signed." Tr. 59.  Mr. Rakoff testified on direct examination by the Government that in accordance with his practice, "I would discuss it [the cooperation agreement] with Mr. Asan.  I know I discussed it with Mr. Asan, and I know discussed the substance of this agreement with him in private on more than one occasion," without specifying the dates or places of such discussions.   Tr. 161.   On cross-examination by counsel for Mr. Asan, Mr. Rakoff, asked to recall "the first meeting you had with Asan," gave this testimony:

> I am not sure I can say I recall the first meeting.  I can recall early meetings, meetings before – my practice, my uniform practice in CJA cases was to first meet with the client and then go meet with the prosecutor and I can't remember a case when I didn't do that.
>
> Q.  Do you recall where your meetings with Mr. Asan took place early on, your representation of him?
>
> A.  Well, we only met in two places that I can recall, three places. We met in my offices at 20 Broad Street.  We met at the MCC. That's the jail, the Metropolitan Correctional.
>
> Q.  MCC?
>
> A.  Yes.  And we met in the U.S. Attorney's Office.  Those are the three places that I can recall.  But which meeting occurred when at where, that I can't tell you.

Tr. 178-179.

10

7.   The evidence reviewed in ¶ 6 does not allow a finding of when and where Mr. Rakoff's first meeting with Mr. Asan took place.  However, the record clearly establishes facts of greater import: how the cooperation agreement, P.Ex. 1, came into existence in the form it took; and the manner of the agreement's execution by its signatories.

8.   The cooperation agreement in this case follows a form familiar to anyone with experience in criminal prosecutions in this District, including trial judges.  I would suppose that a template of the standard cooperation agreement dwells in the bowels of every word processor used by AUSAs in the Criminal Division, such as Mr. Cohen.  When the United States Attorney's Office decides to present a cooperation agreement on its stationery to an individual in the hope that he or she will sign it, the AUSA adopts the form to reflect the facts of the case,  and includes a number of provisions attendant upon the plea of guilty which cooperation agreements routinely contain.  And so it came to pass, and I find, that shortly after Mr. Rakoff's retention under CJA procedures as the attorney for Mr. Asan, Mr. Rakoff conferred with the AUSA, Mr. Cohen, and received from Mr. Cohen two drafts of a proposed cooperation agreement for execution by Mr. Asan.  The second draft was eventually executed after the Government made certain changes requested by Mr. Rakoff to the initial draft.  With respect to these particular facts, I accept the testimony of Mr. Cohen at Tr. 218, and there is really no dispute on the points.

9.   Mr. Rakoff was not satisfied with Mr. Cohen's first draft of a cooperation agreement. Concealing any irritation that he might have felt,  Mr. Cohen testified that his initial draft "came back to me looking like a high school student's marked-up draft [a simile casting Mr. Rakoff as the teacher and Mr. Cohen as the student], which we then proceeded to discuss his proposed comments." Tr. 218.  In point of fact, these were not "proposed *comments*" on the part of Mr. Rakoff; he had

made his comments previously.  What Mr. Rakoff and Mr. Cohen proceeded to discuss were Mr.

Rakoff's proposed *changes* to the standard form agreement, to which Mr. Cohen agreed.  It is

necessary to examine those changes with care because they relate to Mr. Asan's immigration status.

10.  At the time of his arrest, Mr. Asan's immigration status was that of a permanent resident

alien: he held a coveted "green card" issued by the United States immigration authorities.  For

reasons that the record does not reveal, Mr. Cohen had formed the impression and related to Mr.

Rakoff "the fact that Mr. Asan had probably lied in the obtaining of his green card, and that was of

concern to me."  Rakoff, Tr. 158.  The source of Mr. Rakoff's concern was his responsibility as Mr.

Asan's attorney to protect his interests.  Mr. Rakoff sought to deal with this particular concern by

proposing that the Government's promises and undertakings set forth in page 1 of P. Ex.1 be

expanded to include this language:

> In addition, if he fully complies with these understandings, Adnan
> Asan will not be prosecuted by this Office for any criminal violations
> of the immigration laws which he may have committed during the
> course of obtaining permanent resident alien status.

Mr. Cohen agreed and the language was included in the executed agreement.

11.  Further to the general subject of immigration, Mr. Rakoff proposed that the standard

cooperation agreement be amended to add the emphasized phrase within the language I now quote:

> This Office will inform the sentencing Judge, the Probation
> Department, *and the Immigration and Naturalization Service* of (1)
> this Agreement; (2) the nature and extent of Adnan Asan's activities
> with respect to this case; and (3) the full nature and extent of Adnan
> Asan's cooperation with this Office, and the date when such
> cooperation commenced.

Mr. Cohen agreed and the emphasized language was included in the executed agreement.  Mr.

Rakoff explained during direct examination why he wanted that language:

> My job was to get everything I possibly could for my client. He faced very substantial exposure. The most important thing was to get a cooperation agreement. The second most important thing was to get the telephone count [the lesser charge to which Asan ultimately pleaded], but another thing that was of importance was to do what we could to help him on the immigration side.
>
> So I asked – the [G]overnment normally offers to bring the attention to everyone, but I asked to make sure that there was included in that that they would make known to the Immigration and Naturalization Service his cooperation so that the burden would be on them and not on Mr. Asan to bring it to their attention.

Tr. 159.[5]

12.   On January 5, 1984, Mr. Asan pleaded guilty before me to the lesser "telephone" charge referred to in the cooperation agreement. Mr. Rakoff represented him at the plea hearing. The Court accepted Mr. Asan's plea after conducting an allocution. Mr. Asan then continued upon his path of cooperation with the Government, which included giving valuable testimony at the trials of other defendants. On September 5, 1984, this Court sentenced Mr. Asan on his guilty plea. Mr. Rakoff again appeared as Mr. Asan's attorney. Given the nature, extent and value of Mr. Asan's cooperation and the grave personal risks it entailed, all described by the Government, the Court sentenced him to three years' probation. Mr. Asan resumed what appears to have been a tranquil and law-abiding life in the United States with his wife and children until 2007, when ICE agents came to call with an arrest warrant in aid of ICE's decision to deport Mr. Asan to Macedonia because of his 1984 guilty plea to a narcotics charge. In these circumstances, the United States Attorney's office

---

[5]   Perhaps somewhat belatedly, the  INS (now ICE) complied with that obligation when in July 2007, during the pendency of Mr. Asan's first *coram nobis* petition, the United States Attorney for this District sent a letter to ICE "describing Asan's cooperation with the government and its value," a letter which "fulfilled the government's obligations" under the plea agreement. *Asan v. United States*, 2007 WL 2746898, at *1 (S.D.N.Y. Sept. 17. 2007).

wrote a "detailed and eloquent letter to ICE in July 2007, describing Asan's cooperation with the Government and its value"; "ICE's negative response was terse"; however, the "dispute does not fall within the Court's competence to resolve, either under the statutory scheme or the agreements between the parties."  Prior Opinion, 2007 WL 2746898, at *2.  Unmoved by the force and power of the United States Attorney's praise of Mr. Asan, the Department of Homeland Security, acting through ICE and for reasons the record nowhere reveals, deported Mr. Asan to Macedonia, where he now resides.  His wife and daughters remain in the United States.

13.  We now come to the question which lies at the heart of the case: What did Mr. Rakoff and Mr. Asan say to each other on the subject of possible deportation consequences if Mr. Asan pleaded guilty to the lesser narcotics charge specified in the cooperation agreement, signed the agreement, and cooperated with the Government in its prosecution of other participants in the underlying drug conspiracy?  Before analyzing the evidence on that question, I note that in one respect, Mr. Asan's testimony at the hearing contradicts an assertion made on his behalf by counsel in the earlier petition.  I quoted *supra* this claim on page 5 of the petition: "Prior to entering his plea, Petitioner again asked his attorneys at the time about any potential deportation consequences and he was reassured that he would not be deported."  Thus the case for Mr. Asan, as presented by his petition, was that at the plea hearing on January 5, 1984, Mr. Asan pressed Mr. Rakoff on possible deportation consequences, and Mr. Rakoff repeated the broadly phrased "no deportation" reassurance he had given on November 22, 1983, when Mr. Asan signed the cooperation agreement.  However, at the hearing Mr. Asan testified on direct examination as follows:

> Q.  What was your belief with respect to your immigration status at the moment you entered your plea of guilty before this court?
>
> A.  Oh, sir, that was clear to me that, that everything was settled

14

> down, that the deportation matter as my lawyer explained to me when
> I signed the agreement so I did not ask him anything more.

Tr. 44.  Later during the hearing, the Court reminded Mr Asan that at this plea hearing, he had not

mentioned any promise that he would not be deported if he pleaded guilty, and asked him why not.

Mr. Asan responded:

> Because from the side of my lawyer, Mr. Rakoff, it was clear that
> there will not be deportation.  I did not know that pleading guilty of
> the aggravated felony that I will not have any kind of a waiver by
> immigration.  I did not know anything about the immigration law, or
> I did not even know if I plead guilty of the aggravated felony can
> deport me from the United States.  I didn't know.
>
> That's why I remained silent.  I just strictly relied on Mr. Rakoff
> when he told me that the government put you in the witness
> protection program and then you will not be deported.

Tr. 129.  Mr. Asan's reference to "the witness protection program" indicates that the discussion with

Mr. Rakoff in question occurred at the time the cooperation agreement was under consideration and

then signed, in November 1983, because that is when the subject of the protection program came up.

14.   The testimony quoted in ¶ 13 of these Findings makes it clear, and I find, that contrary

to the assertion in the petition, Mr. Asan and Mr. Rakoff did not have a substantive discussion on

the subject of deportation consequences during the course of the plea hearing on January 5, 1984.

The most that happened on that day, according to Mr. Asan's testimony, is that while Mr. Asan and

his family were being conveyed to the courthouse by United States marshals, Mr. Asan heard one

of the marshals mention taking the Asans to "the airport."  Alarmed, Mr. Asan said to his attorney:

"Mr. Rakoff, why are they talking these people about the airport?  Are we going to Yugoslavia? I

thought I was supposed to be tak[en] to the Witness Protection Program."  Mr. Rakoff responded:

"Mr. Asan, you are not going to Yugoslavia but I cannot tell you what it is like at Witness Protection

Program because that remains in marshals' hands." Tr. 91.  During the May 2012 hearing on the present petition, Mr. Asan did not describe any general reassurances about deportation made by Mr. Rakoff at the time of the guilty plea, and that assertion is deemed abandoned by the petitioner.

15.  Accordingly, I find on the evidence that the principal substantive discussions between Mr. Asan and Mr. Rakoff on the subject of deportation consequences took place on or about November 22, 1983, the date on which Mr. Asan signed the cooperation agreement.  The agreement, proposed and then executed, generated the discussions.

16.  During cross-examination by the Government about events during the plea  hearing, Mr. Asan referred back to those earlier discussions and what he understood Mr. Rakoff to have said to him.  Mr. Asan testified: "Those are the conversations when Mr. Rakoff assures me that I must sign the agreement and I relied on this advice that there will not be deportation."  Tr. 92.

17.  Mr. Asan says that during his consideration of the proposed cooperation agreement and whether or not he should sign it and cooperate, Mr. Rakoff advised him that "the government is offering you protection, but not deportation."  Tr. 32.  Evidently, Mr. Asan interpreted that to mean that if he signed the agreement and cooperated, "I was cool on that side," that is, on the question of deportation.  Tr. 34.  He further testified on direct examination:

> After I heard from my lawyer Mr. Rakoff saying you'll be saved from this side of deportation because the government offering you protection and not deportation.  So that clear to my mind that I am safe on the side of deportation.
>
> * * * * * * *
>
> Q.  Would you have signed this agreement and cooperated if you were told that you would face deportation by entering this plea of guilty?
>
> A.   No, sir, absolutely not.

16

\* \* \* \* \* \* \*

Q.  Did Mr. Rakoff ever tell you that you could be deported if you signed this agreement?

A.  No, sir, no, he did never tell me.

Q.  Did he tell you that you would be deported if you signed this agreement?

A.  No, sir.  Absolutely no such thing came from Mr. Rakoff suggesting to me that you will be deported, no, not deported.  That is what the advise [sic] was.

Q.  Can you repeat that?

A.  Only advice I got from Mr. Rakoff that you will not be deported. Of course he says you go into Witness Protection Program, how the [G]overnment going to deport you if they are putting you in Witness Protection Program?  I remember that sort of stuff he said that guaranteed me that will not be deportation.

Tr. 33, 35-36.[6]

18.  Mr. Asan's wife, Fluterjie Asan, also testified at the hearing.  I will refer to her as "Mrs. Asan."  Mrs. Asan testified that she was present at the meeting in Mr. Cohen's office when Mr. Asan signed the cooperation agreement.  Mrs. Asan testified that she read the cooperation agreement, and continued on direct examination:

Q.  Why did you read it?

A.  It was important to us because it says specifically – that's how we understood it, me and my husband then – that there would not have

---

[6]  I have  quoted  from the transcript exactly as it appears.  The meaning and substance of Mr. Asan's testimony are  clear, notwithstanding the occasional misspellings and grammatical lapses, which may be ascribed to his imperfect grasp of the English language or the vagaries of transcription.  (I should add that Mr. Asan's command of English was impressive and he presented his views forcefully and understandably; and the quality of the transcription from the closed-circuit televised hookup is excellent).

17

any criminal violation or immigration law which he may have criminal violation – I'm sorry. I can't see well, but I know it was for immigration. And that's what, you know, made us happy.

And then I turned to my husband and – because, of course, we both discussed it as much as we understood. Then when I told my husband that it says something about immigration, that we are not going to be, have any problem with immigration, and he turned to Mr. Rakoff, his lawyer, to make sure, because we did not understand very well, even though I read, I know more English than him. And Mr. Rakoff, then he said clearly, It says that you are going to be protected. You are not going to be deported.

Q. Did you hear Mr. Rakoff saying this to your husband?

A. Yes. I was there.

Q. Do you recall if he was addressing both you and your husband or simply your husband?

A. I was, as much as I remember, as much as I recall, my husband was this side, and he was there to my husband, to us.

Q. Do you recall specifically what Mr. Rakoff discussed with respect to deportation to the best of your ability?

A. Because of the agreement we were supposed to go to witness protection program. And he specific – he assured my husband, and Mr. Cohen, too, that we are not going to have any problems. We are being protected. We are not going to be deported and have problems. And we didn't know about this witness protection program.

Tr. 134-136. Returning to this discussion on cross-examination, Mrs. Asan testified:

Q. I've just handed you the cooperation agreement, which is marked Petitioner's Exhibit 1. And I am going to read you a sentence on the first page. It is actually underlined in the copy you are looking at.

"In addition if he fully complies with these understandings, Adnan Asan will not be prosecuted by this Office for any criminal violations of the immigration laws which he may have committed during the course of obtaining permanent resident alien status."

That is the sentence that Mr. Rakoff was referring to when he said

18

that your husband would not be deported?

A.  Yes.  But Mr. Rakoff – it was me when I read this and my husband.  But Mr. Rakoff, when my husband asked him to be sure, he said – he asked him, Does this mean I am not going to be deported?

He said, Yes.  You are being protected.  How can you be deported? That I remember very clearly.

Q.  When your husband asked the question, he was referring to that sentence in the plea agreement, the one I just read?

A.  Yes.

Tr. 143-144.

19.  I turn now to the testimony given by Mr. Rakoff during the hearing.  Although asked to do so on cross-examination by counsel for Mr. Asan, Mr. Rakoff did not undertake to repeat "the exact conversations" he had with Mr. Asan about the meaning and effect of the cooperation agreement within the context of immigration and deportation; rather, Mr. Rakoff said "I remember the gist of the conversation," a phrase he used more than once.  The noun "gist" has an established meaning: the *Oxford English Dictionary Compact Edition* (23rd printing  U.S. –  January 1984) defines it as "1.  Law: The real ground or point (of an action, indictment, etc,)", quoting (1769) Blackstone Commentaries IV 333: "These charges . . . are the points and very *gist* of the indictment. 2.  The substance or pith of the matter, the essence or main part."  The *Random House Dictionary of the English Language, College Edition* (1969) at 558: is to the same effect: "The main or essential part of a matter: What was the *gist* of his speech?"  Trial lawyers employ their own version of this concept.  They will frequently ask a witness: "What did that individual say to you, in words or substance?"  "Words" means the *exact* words.  "Substance" means the *gist*.

20.  Thus, Mr. Rakoff described in his testimony his discussion with Mr. Asan about the

19

provision in the cooperation agreement that the United States Attorney's office would not prosecute

Mr. Asan for criminal violations of the immigration laws in obtaining his green card:

> [N]o one can remember the exact conversation 28 years later. But I
> remember the gist of the conversation. And the gist of the
> conversation was that they have another whole charge that they could
> bring against you and I wanted to make sure that you are not going to
> be prosecuted for that charge.

Tr. 190.

     21. As for the provision in the cooperation agreement that the United States Attorney's office

would inform the Immigration and Naturalization Service of the full nature and extent of Mr. Asan's

cooperation, Mr. Rakoff testified:

> Although many years have elapsed I am confident that I informed Mr.
> Asan that there was no guaranty he would not be deported but that
> absent his cooperation, deportation was virtually certain and that the
> government's input to the immigration authorities might be helpful
> to him if he wished to try to avoid deportation. (At that time he was
> uncertain as to whether he wanted to return to Yugoslavia or not).[7]
>
>         \*   \*   \*   \*   \*   \*   \*
>
> So, he was deported. I mean, I've never seen the deportation
> proceedings, so I don't know what the grounds were given but I know
> that at the time I represented him the likelihood of eventual
> deportation was very, very high and I so informed him.
>
>         \*   \*   \*   \*   \*   \*   \*
>
> So second, he had committed numerous serious narcotics offenses,
> one involving allegedly a conspiracy to import multi-kilograms of
> narcotics and I knew enough about the immigration law to know that
> those things normally lead to deportation.

---

[7] The declarations in this paragraph were contained in an e-mail, P. Ex. 2, Mr. Rakoff sent on May 13, 2007, to an attorney named Peter Till, who was representing Mr. Asan in connection with his deportation proceedings. Mr. Till asked Mr. Rakoff to comment on events occurring in 1983 and 1984, when Mr. Rakoff represented Mr. Asan. Mr. Rakoff adopted and reiterated these declarations during the hearing before this Court.

\* \* \* \* \* \* \*

Here was the gist of what I recall I said to him. I knew from experience in the U.S. Attorney's Office that lots of – [w]ithdrawn – that some cases which seem like open and shut for deportation, sometimes you could get at least a postponement of the cooperation and that the law in this area was changing. It had already undergone a number of changes. And so that no one could ever say it absolutely is going to happen X, Y and Z. There are very few areas of the law I think you can say that about. I think there is always a certain give. And there was a relationship between the government, the criminal prosecuting authorities in the U.S. Attorney's Office and Department of Justice and deportation folks that certain accommodations were sometimes made.

So what I was conveying to him and I think there is absolutely no doubt that he fully understood this, was that the chances were very high that absent a cooperation agreement he would be deported, that with the cooperation agreement he would at least stave it off for a while during his period of cooperation and that there might be some possibility that things could turn out all right. And that's why it was important to get the provision which we hadn't gone to [gotten to?] yet but the provision that the U.S. Attorney could make his cooperation known to the immigration authorities.

\* \* \* \* \* \* \*

But what I said was that it wasn't impossible that he might avoid deportation but he shouldn't rely on that in any way, shape or form but it wasn't an absolute impossibility.

\* \* \* \* \* \* \*

But it is certainly correct that what I said to Mr. Asan was that, absent cooperation, you face a very high likelihood of deportation. Can I remember whether I used the words very high likelihood or some other formulation? No, I can't say that. But that was clearly the gist. I am absolutely certain that I conveyed to him a very high likelihood of deportation, and he faced it whether or not he cooperated, but the chance that he could avoid it, if at all, would be greater if he cooperated than otherwise.

\* \* \* \* \* \* \*

21

What I am certain of is that the gist of what I told Mr. Asan repeatedly was that there was a very high likelihood of deportation, that the one thing we could do that might possibly give him an out, though no one should rely on this, was to bring his cooperation to the attention of the INS.

Tr.  193, 195, 197, 198, 201, 205.

22.  I have found that the substantive discussions with respect to deportation consequences of the cooperation and guilty plea took place during or in preparation for the November 22, 1983 meeting in the United States Attorney's office, at the conclusion of which Mr. Asan signed the agreement.  In ¶¶ 17, 18, 20 and 21, I quoted the testimony of the witnesses on what was said and by whom at that time.  Mr. Asan gave further testimony on the point in response to questions I then put to him:

THE COURT: During that discussion did anyone refer to deportation? Did that word come up?

A.  Yes, sir, it did.

THE COURT: Do you recall who first mentioned deportation?

A.  Yes, sir.  I mentioned it first, deportation because I was expecting my green card to come.  I was the one who mentioned from early meeting about deportation, because my green card was taken away from me.  As the federal agents promised me they are going to return my green card and they are going to let me go free.  But unfortunately it didn't happen.  That green card reminded my mind, that I was so sad why my green card was taken, and that's how I brought that conversation to the prosecutor through my lawyer.  My understanding was that by them taking my green card that means they can deport me.  So that's how that question comes to deportation to my lawyers and to the prosecutors.

THE COURT: So it is your memory, then, your recollection, that at that meeting in Mr. Cohen's office at which you signed the cooperation agreement you were the first one of those who were there to mention the subject of deportation?  Is that correct?

22

A.  Yes, sir.

THE COURT: And when you did so, did Mr. Rakoff say anything about deportation?

A.  Your Honor, when I read this agreement I first asked my wife, how does it look.  My wife was present.  And after me, I and her understanding that there will not be any prosecution on the immigration matter, then I turned and asked my lawyer, which was Mr. Rakoff, and Mr. Rakoff advised, came to me saying, Mr. Asan, that the government is offering you protection as alone.  The agreement speaks for itself.  It does not offer deportation,  so you will not be deported.  Relax.  Your wife and kids are going with you. They will fill out a petition for your wife so she can become legal. That was our understanding, your Honor.

Tr. 125-127.  During prior cross-examination about his subsequent guilty plea, Mr. Asan reprised

what one might call the gist of that earlier advice, given to him by Mr. Rakoff at the time Mr. Asan

signed the cooperation agreement.   AUSA Lonergan asked: "So the first  time you heard that you

had this right to go to trial was at the guilty plea proceeding but you just decided to plead guilty

anyway?"  Mr. Asan responded: "Yes, because I have this, even here that you will be protected.  You

will not be deported."  Tr. 107.

23.  In his testimony on direct examination, Mr. Rakoff described the manner in which the

subjects of protection and deportation came together during his discussions with Mr. Asan at the

time the cooperation agreement was negotiated and signed.  The cooperation agreement provided

that "if necessary and appropriate in the view of [the United States Attorney's] Office, arrangements

may be made whereby Adnan Asan and his family can be relocated under a new identity in order that

no harm come to any of them as a result of Adnan Asan's cooperation."  That is a reference to the

Witness Protection Program, administered by the United States Marshal's Office.  Mr. Rakoff

testified that "Mr. Cohen had made clear from the outset that there was some risk of violence in

23

connection with his cooperation and that therefore they we likely to be asking him to be part of the

witness protection program." Tr. 163.  Mr. Rakoff continued:

> Indeed, that was something that Mr. Asan, like anyone in that situation, had initial concerns about.  It is not anything anyone would undertake lightly.  He and I discussed that on several occasions, and eventually he decided that it was the prudent thing to do, so he agreed to that provision. . . .
>
> Q.  Were your conversations about the witness protection program related to or separate from your conversations about cooperation and deportation?
>
> A.  About?
>
> Q.  About deportation?
>
> A.  Largely separate.  The only time I can recall that the two were in any way mentioned together was that at one point I think I said to him in words or substance that of course you won't be deported during the period of your cooperation.  That I think is likely.  But other than that the discussions were separate.
>
> Q.  When you said to him that you will likely not be deported during the period of your cooperation, did you explain further what that meant?
>
> A.  Yes.  I said that, you know, my understanding is that the government is going to ask you to cooperate for some months, maybe conceivably a year or so, and that they'll probably want you to testify as well.  So they'll want you here, and they will probably ask the INS not to initiate any deportation proceedings, at least during that period.
>
> Q.  Did you explain that that meant it wasn't forever?
>
> A.  Yes.

Tr. 164-165.

      24.  Mr. Rakoff and Mr. Cohen both testified that under the statutory scheme, the United

States Attorney's Office did not have the authority to promise or even suggest to a defendant in a

criminal case that as a reward for cooperating with Government prosecutors in a criminal case, he would never be deported by Government immigration authorities. Any decision to deport an individual from the United States lay then, and lies today, within the discretion of different officers in the Executive Branch of Government. In 1983, the Attorney General sat atop the prosecutorial and immigration (INS) branches of the Department of Justice. Today, INS has been succeeded by ICE, within the purview of the Secretary of Homeland Security, but the separation of functions remains the same. Mr. Rakoff testified that, in keeping with that division of executive branch responsibilities, he would not have assured Mr. Asan he would never be deported, and in fact did not do so. Mr. Cohen gave the same testimony with respect to any discussions he had with Mr. Asan.

25. Three of the four witnesses who testified at the May hearing had personal knowledge of the substance of the discussions between Mr. Asan and Mr. Rakoff on or about November 22, 1983 on the subject of deportation consequences of Mr. Asan's plea and cooperation. Those witnesses are Mr. Asan, Mrs. Asan, and Mr. Rakoff. Mr. Cohen did not participate in those discussions and knows nothing about them.

26. None of these three witnesses is disinterested. Mr. and Mrs. Asan wish to restore their marital, family and home life, which the Government destroyed when it deported Mr. Asan to Macedonia 23 years after he rendered highly valuable service to the Government in a major criminal case at grave risk to his and his family's safety. Having failed to obtain *coram nobis* relief on the ground that the Government broke its word to him, Mr. Asan now seeks *coram nobis* relief on the only ground cognizable by this Court he has left: that Mr. Rakoff, his CJA-appointed attorney in 1983 and 1984, rendered professional services to Mr. Asan at the time of his guilty plea so deficient that they violated Mr. Asan's constitutional right to the effective assistance of counsel. Mr. Asan's

criticism of Mr. Rakoff focuses upon the advice that Mr. Rakoff gave or did not give to Mr. Asan with respect to the possible deportation consequences to Mr. Asan if he cooperated with the Government and pleaded guilty to a narcotics felony in furtherance of that cooperation.  Mr. and Mrs. Asan have an interest in remembering the details of the advice Mr. Rakoff gave or omitted to give in such a way as to support that claim of ineffective assistance.  Mr. Rakoff has an interest in remembering the details of his advice in such a way as to vindicate the quality of his professional services.  A fact finder is bound to acknowledge these inherent elements of self-interest, which arise naturally and inevitably from the human condition.

27.  The accounts given by the witnesses of the pertinent discussions between Mr. Rakoff on the one hand and the Asans (particularly Mr. Asan) on the other are in agreement in some respects and differ in others.  Where there are factual disputes, the Court resolves them by applying the usual time-tested criteria: the credibility of the witnesses, the presence or absence of corroborating evidence, the inherent plausibility or implausibility of one version of facts or the other – all viewed within the totality of the evidence in the record.  In this context, evaluating "credibility" is not limited to considering whether  a witness knowingly gave false testimony or was trying to tell the truth.  I am satisfied that each witness before the Court did his or her best to describe the facts accurately, in accordance with the witness's best  present recollection of events that took place some 28 years earlier.  The Court's function and responsibility is to determine which, *if either*, version of the facts is *probably* true.   I stress "probably" because the law does not require certainty, either in this civil case where the burden of proof is a preponderance of the evidence, or in a criminal case, where a jury's doubt will bar conviction only if it is reasonable.  I stress "if either" because it is conceptually possible that the evidence would leave the fact finder unable to decide which account

is probably true, an inability that would place the party bearing the burden of proof in a difficult position.  But this is not such a case.  I find myself able to determine from the evidence what probably happened.

28.  When Mr. Rakoff was assigned by the CJA program to represent Mr. Asan and the two first met each other, Mr. Asan had at least three grave concerns: the Government's very serious narcotics charges against him; his safety and that of his family if he cooperated with the prosecutors and testified against the drug conspiracy architects, as the Government asked him to do; and his own immigration status.  That third concern was prompted by the Government's action in taking Mr. Asan's green card from him, with no indication as to when it would be returned.  Quite naturally, Mr. Asan regarded the confiscation of his green card as a frightening and unwelcome possible precursor to his deportation to Yugoslavia (as that troubled part of the world was then called).  Mr. Asan's concern in that regard was heightened by his knowledge that AUSA Cohen and other Government personnel seemed to have formed the impression that Mr. Asan had acted illegally in obtaining his green card.

29.  I find that after Mr. Rakoff negotiated the terms of the cooperation agreement with Mr. Cohen and obtained the two additional provisions described in ¶¶ 10 and 11, he conferred privately with Mr. Asan and explained the contents of the agreement, line by line, with Mrs. Asan also participating.  A cooperation agreement, such as the one in evidence, is of crucial importance to an individual charged with serious crime.  The agreement's terms and conditions fashion a blueprint for the rest of a defendant's life.  An experienced, careful and conscientious defense attorney is bound by the most basic professional responsibilities to explain those terms and conditions carefully to a client.  I find no reason to find or to suppose that Mr. Rakoff omitted to do so on this occasion.

27

Indeed, Mrs. Asan's testimony quoted at ¶ 18 furnishes an illustration of that sort of line-by-line analysis and discussion.

30.   The principal discussion between the Asans and Mr. Rakoff about the cooperation agreement took place on November 22, 1983, in the prosecutors' office, before Mr. Asan signed the agreement.  Owing to Mr. Asan's concern about his immigration status, his discussion with Mr. Rakoff turned almost immediately to Mr. Asan's fear of deportation attendant upon the Government's confiscation of his green card.  The testimony of Mr. Asan quoted in ¶ 22 makes it clear that Mr. Asan first raised the subject of deportation, and that he did so within the specific context of the Government's retaining his green card, the source of Mr. Asan's immediate concern about deportation.

31.  AUSA Cohen had previously mentioned to Mr. Asan the possibility of placing him and his family in the Witness Protection Program, a placement also referred to in the cooperation agreement.  In Mr. Cohen's perception, Mr. Asan's hoped-for cooperation would place him and his family at risk of reprisal.  In consequence, the Witness Protection Program was also factored into Mr. Rakoff's early discussion with Mr. Asan.  Mr. Rakoff made two points to Mr. Asan.  First, Mr. Rakoff explained the reason for and salutary effect of the provision in the cooperation agreement that if Mr. Asan complied with the agreement, the Government would not prosecute him for any criminal violations of the immigration laws attendant upon obtaining his permanent resident alien status.  Second, Mr. Rakoff, continuing to address Mr. Asan's concern about deportation, emphasized the Government's desire to obtain Mr. Asan's cooperation, as evidenced by the cooperation agreement and Mr. Cohen's reference to the Witness Protection Program.  Mr. Rakoff said to Mr. Asan and Mrs. Asan, in words or substance, that the Government was interested in protecting Mr. Asan, not

deporting him.   Mrs. Asan's testimony is squarely on point.   She referred to the cooperation agreement, and testified: "And Mr. Rakoff, then he said clearly, It says you are going to be protected. You are not going to be deported."   Tr. 135, quoted in ¶ 18.   She added that Mr. Rakoff said: "You are being protected.   How can you be deported?"   Tr. 144.   To the same effect, Mr. Asan paraphrased Mr. Rakoff's advice at Tr. 32: "the government is offering you protection, but not deportation."   Mr. Rakoff's testimony is the same in substance: he told Mr. Asan that "absent a cooperation agreement he would be deported, that with the cooperation agreement he would at least stave it off for a while during his period of cooperation," Tr. 197, which is to say, that the Government was going to protect Mr. Asan *while he was cooperating*, and not deport him *during that time*.

32.   It is readily and unmistakably apparent, and I find, that Mr. Asan and Mrs. Asan interpreted Mt. Rakoff's choice of words – "protection not deportation" – as an assurance that if Mr. Asan pleaded guilty and cooperated, the Government would not deport Mr. Asan at any time thereafter.   That interpretation on the part of the Asans is entirely understandable in human terms. The Asan family was greatly concerned about Mr. Asan's vulnerability to deportation.   Given the recent events befalling them, the Asans could hardly feel otherwise.   Just as beauty lies in the eye of the besotted beholder, words of reassurance resound in the ears of the apprehensive auditor.   Mr. Rakoff undertook to explain to Mr. and Mrs. Asan the precise meanings of a legalistic document (the cooperation agreement) in a language (the document and the explanation) that was not the Asans' native tongue (although the services of an interpreter were not required).   Mr. Asan and Mrs. Asan, facing a future of perilous uncertainty, urgently needed and fervently hoped for an assurance by their professional defender that the Government's offer of "protection and not deportation" (Mr. Asan's phrase, Tr. 33) meant "not deportation *ever*."   The Asans' testimony, that this is what Mr. Rakoff

said to them, is born not of a present desire to deceive, but of a past urgent need.  That is to say: I am satisfied that at the hearing in May 2012, Mr. Asan and Mrs. Asan testified truthfully about what they understood Mr. Rakoff to be saying to them in November 1983.

33.  Nonetheless, I am constrained to find that Mr. and Mrs. Asan misinterpreted and misunderstood what Mr. Rakoff said to them, because I accept Mr. Rakoff's testimony that he never told either Mr. or Mrs. Asan that if Mr. Asan pleaded and cooperated, the Government would *never* deport him.  It is inherently implausible to suppose that Mr. Rakoff gave an assurance against deportation open-ended as to time.  Mr. Rakoff was an experienced former AUSA and Government criminal prosecutor, as well as a subsequent convert to the defense side on the CJA panel.  He knew that a United States Attorney's office within the Department of Justice had no authority to suggest, let alone promise, that if an alien defendant cooperated with that office, immigration authorities occupying an entirely separate place within the Executive Branch of Government would guarantee the defendant against any future deportation.  At the time of his representation of Mr. Asan, Mr. Rakoff did not have, and could not have had, the belief that the United States Attorney had the power to make such a promise; and he did not advise Mr. Asan that the prosecutors had that power or had exercised it in Mr. Asan's favor.

34.  Moreover, there is a tension between the wording of the cooperation agreement, P. Ex.1, and the interpretation the Asans seek to place upon Mr. Rakoff's advice to them.  As I have previously found, Mr. and Mrs. Asan agree with Mr. Rakoff that, before Mr. Asan signed the cooperation agreement, Mr. Rakoff explained its contents to them, line by line, and answered the Asans' questions about certain provisions.  ¶ 11 of these Findings quotes the amendment to the standard cooperation agreement Mr. Rakoff obtained during his negotiations with AUSA Cohen: the

provision that in addition to the usual recipients (sentencing Judge and Probation Department), the United States Attorney's Office promised to inform "the Immigration and Naturalization Service" of "the full nature and extent of Adnan Asan's cooperation" with the prosecutors.  Mr. Rakoff regarded that provision as important in order "to do what we could to help [Mr. Asan] on the immigration side," ¶ 11, an objective sought to be achieved by ensuring that the United States Attorney would "make his cooperation known to the immigration authorities." ¶ 21.  If, as Mr. Asan now asserts, he understood Mr. Rakoff to be advising him that his guilty plea and cooperation would immunize him absolutely from future deportation, there would be no need to include this particular provision in the cooperation agreement.

35.  I find that the substance of Mr. Rakoff's advice to Mr. Asan on the subject of deportation is accurately described in Mr. Rakoff's testimony quoted in ¶ 21, *supra*.  The essence of that advice is captured in one sentence appearing in those quotations: "I am absolutely certain that I conveyed to him a very high likelihood of deportation, and he faced it whether or not he cooperated, but the chance that he could avoid it, if at all, would be greater if he cooperated than otherwise."  That is a correct statement of the circumstances in which Mr. Asan found himself.  Mr. Asan's counsel on this petition do not contend otherwise: on the contrary, they contend that Mr. Rakoff gave constitutionally incompetent advice precisely because he *did not* say that to Mr. Asan.

36.  Is there evidence in the record from which the Court can find or reasonably infer that Mr. Rakoff never gave that particular advice to Mr. Asan?  I begin with the observation that during the hearing, neither Mr. Asan nor Mrs. Asan testified directly that Mr. Rakoff did not give that "high likelihood of deportation" advice to them.  The closest Mr. Asan came was in the testimony quoted in ¶ 17.  He there denied that Mr. Rakoff "ever [told] you that you could be deported if you signed

31

this agreement," which is a quite different proposition, and undertook to summarize Mr. Rakoff's advice on the subject by saying: "Only advice I got from Mr. Rakoff that you will not be deported. Of course he says you go into Witness Protection Program. I remember that sort of stuff he said that guaranteed me that will not be deportation." One detects in that testimony the coupling in Mr. Asan's mind of protection and deportation in such a manner as to create the impression, inaccurate but eagerly grasped, that no deportation then meant no deportation forever. But the present point is that Mr. Rakoff testified repeatedly that he advised Mr. Asan repeatedly that, cooperation or no, deportation was likely. Mr. Asan was present during the hearing when Mr. Rakoff gave that testimony, and did not seek to disagree with it on rebuttal, although the Court tendered the opportunity to do so. After the Government rested its case, this exchange occurred:

> THE COURT: Does the petitioner seek to offer any evidence in rebuttal?
>
> MR. BAURKOT: Could I have one moment, your Honor.
>
> THE COURT: Sure.
>
> MR. LAHOUD: Your Honor, we have no rebuttal.
>
> THE COURT: Very well. Both parties rest.

Tr. 232.

37. If in fact Mr. Rakoff did not advise Mr. Asan about the likelihood of deportation, then one must conclude that when Mr. Rakoff testified that he gave that advice repeatedly, he was either deliberately testifying falsely, or was mistaken, albeit in good faith. Petitioner's post-hearing brief hints at the first theory, suggesting that Mr. Rakoff sought to defend his professional reputation, but if the argument is that Mr. Rakoff perjured himself at the hearing, I reject it as without any legitimate basis.

32

38.  Whether Mr. Rakoff believed that he had given this particular advice, whereas in fact he had not done so, is a more complicated question.  As noted previously, Mr. Rakoff does not claim to quote himself directly with respect to advice given to Mr. Asan in 1983.  The account he gives of this aspect of his discussions with Mr. Asan – the likelihood of deportation –  is "gist" testimony.  Mr. Rakoff referred at times to his usual practices and procedures as a CJA defense attorney, thereby conjuring up the shade of Federal Rule of Evidence 406, which provides that "[e]vidence of a person's habit" is relevant to prove that "on a particular occasion the person . . .  acted in accordance with the habit or routine practice."  The Rule is a useful probative tool when the habit in question is established and ingrained, but in 1983 Mr. Rakoff's experience as a criminal defense attorney with a client facing deportation consequences was limited, and I do not think Rule 406 applies with any force.  It is the fact, however, that Mr. Rakoff was an experienced former AUSA in criminal cases, and I find that he was entirely familiar with the deportation vulnerabilities confronting Mr. Asan, his CJA-acquired client.  The evidence shows that in the first substantive discussion between Mr. Asan and Mr. Rakoff, it was Mr. Asan who raised the subject of deportation and his quite natural concerns about it, and one may reasonably assume that Mr. Rakoff advised Mr. Asan fully on this sensitive and important issue.  Mr. Rakoff professes and proclaims his determination to protect Mr. Asan's interests in every way, and I accept that self-evaluation because it is inherently plausible and evidenced by Mr. Rakoff's conduct during the representation, *viz*., the amendments and alterations Mr. Rakoff insisted upon, for Mr. Asan's benefit,  to the cooperation agreement drafted by AUSA Cohen.  Given these circumstances, I find it to be more probable than not that Mr. Rakoff gave to Mr. Asan the particular advice about deportation prospects that Mr. Rakoff described in his testimony.

### III.   CONCLUSIONS OF LAW

1.  This Court has jurisdiction over the subject matter of this petition and the parties to it.

2.  The Petitioner, Adnan Asan, asserts that he did not receive the effective assistance of counsel in 1983, when he entered into a cooperation agreement with the Office of the United States Attorney for this District, and in 1984, when pursuant to that agreement he pleaded guilty to a felony narcotics charge.  The petition states a claim for a violation of Asan's rights secured by the United States Constitution.  The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."  The Supreme Court has made it clear that in order to satisfy that right, defense counsel must be *competent* and the assistance rendered *effective.*  These constitutional principles squarely apply to the procedural circumstances of the case at bar.  "Before deciding whether to plead guilty, a defendant is entitled to 'the effective assistance of competent counsel.'" *Padilla v. Kentucky*, __U.S. __, 130 S.Ct. 1473, 1480-81 (2010) (citing and quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970), and *Strickland v. Washington*, 466 U.S. 668, 686 (1984)).

3.  Under *Strickland* and its progeny, a court evaluating an ineffective assistance claim must first determine whether counsel's representation "fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  Constitutional deficiency "is necessarily linked to the practice and expectations of the legal community," so that "'[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Padilla*, 130 S.Ct. at 1482 (citing and quoting *Strickland* at 688). If counsel's representation is shown to have fallen below that level, "[t]hen we ask whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (citing

34

and quoting *Strickland* at 688).  That is the aspect of ineffective assistance analysis referred to as "prejudice."

4.   The case at bar presents the question whether defense counsel rendered effective assistance to petitioner in advising him about the deportation consequences of a guilty plea to a narcotics charge.  Whatever doubts may have previously existed in principle about defense counsel's duty to advise a defendant about deportation consequences, the Supreme Court dispelled them in *Padilla*.  *Padilla* held that when "the terms of the relevant immigration statute are succinct, clear and explicit in defining the removal consequence for [a defendant's] conviction," "the duty to give correct advice is equally clear," and incorrect advice or the failure to render advice falls below an objective standard of reasonableness.   In contrast: "When the law is not succinct and straightforward," a criminal defense attorney "need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." 130 S.Ct. at 1483. These are the two optional forms of advice *Padilla* makes available to counsel to give to defendants for whom deportation is a complicating factor.  Counsel must give one form or the other, depending upon the circumstances.  *Padilla* makes it clear that a defense attorney in such a case who says nothing about deportation consequences, whether or not the defendant asks about them, is constitutionally ineffective.

5.   When Mr. Rakoff represented Mr. Asan in 1983 and 1984, his duty to advise Mr. Asan about the deportation consequences of a guilty plea was probably no greater in this legal community than that the Second Circuit articulated eight years later, in *United States v. Couto*, 311 F.3d 179, 188 (2d Cir. 2002) ("an affirmative misrepresentation by counsel as to the deportation consequences of a guilty plea is . . . objectively unreasonable.").  In *Padilla*, the Supreme Court eliminated the

35

distinction between a failure to inform and an affirmative misrepresentation.  There is no other way to interpret this language in *Padilla*: "But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear."  130 S.Ct. at 1483.  That holding applies to the case at bar, since both parties agree that under the immigration laws in effect in 1984, Mr. Asan's plea of guilty to a narcotics offense made his subsequent deportation almost inevitable.

6.  If  *Padilla* is to measure Mr. Rakoff's representation of Mr. Asan, the case must be applied  retroactively.  The Second Circuit has not ruled on the issue of *Padilla*'s retroactivity, and other circuits have reached differing conclusions.  *See Matos v. United States,* No. 99 Cr. 137, 2012 WL 569360, at *5 (S.D.N.Y. Feb. 16, 2012) (citing cases).  The Supreme Court will resolve the question later this Term, having granted certiorari in *Chaidez v. United States*, 655 F.3d 684 (7th Cir. 2011), in which two Seventh Circuit judges said *Padilla* did not apply retroactively and the dissenter said that it did.

7.  In the case at bar, I need not reach the question of *Padilla*'s retroactivity because even if one measures Mr. Rakoff's representation by the Supreme Court's holdings, strictures, and analyses in *Padilla*, Mr. Rakoff's advice to Mr. Asan about deportation consequences passes constitutional muster.  To state the converse, and perhaps more precise proposition: Mr. Asan has not sustained his burden of proving that the advice Mr. Rakoff gave him *did not* constitute the effective assistance of counsel.  This is not a case of a defense counsel failing to give any advice about deportation consequences to a vulnerable defendant.  Shortly after they met, Mr. Asan asked Mr. Rakoff about his immigration and deportation status, and Mr. Rakoff responded.

8.  The advice that Mr. Rakoff gave to Mr. Asan about deportation is described in Part II, the Court's Findings of Fact.  Those Findings are the result of the most careful consideration of the

36

evidence that lies within my abilities.  Having made those Findings, I now Conclude as a matter of

Law that Mr. Rakoff's advice to Mr. Asan on the subject was correct and competent.  It did not fall

below an objective standard of reasonableness, whether that standard be measured pre- or post-

*Padilla.*

## IV.  CONCLUSION

It follows from the foregoing Findings of Fact and Conclusions of Law that Mr. Asan has not

satisfied the first prong of the *Strickland* formula for ineffective assistance of counsel, and his

petition for a writ of error *coram nobis* must be dismissed. I do not reach the second question of

prejudice.  The Clerk of the Court is directed to dismiss this petition, and close the case.

It is SO ORDERED.[8]

---

[8] The following comments  appear in the humbler position and smaller letters of a footnote, rather than in the text of this opinion, because I am sensitive of and obedient to the Separation of Powers, the foundation upon which the Nation's government is constructed.  I serve in the Judicial Branch of the Government.   These words, addressed by a judicial officer to a Department of the Executive Branch, are and can only be precatory, not adjudicative.

The decision in 2007 to deport Adnan Asan from the United States to Macedonia was made by the Secretary of the Department of Homeland Security, within whose structure ICE is found.  I am of course aware that in all likelihood, the actual decision was made by immigration officials within the Department, without the participation or perhaps even the knowledge of the Secretary. But the authorized acts of Executive Branch officers are frequently characterized in legal proceedings as the acts of "the Secretary" in whose name the officers act.  In what follows, I make use of that practice of personalization.

I have been the District Judge presiding over the underlying criminal case since its inception, and am familiar with the entire record.  The case has passed through the stages of indictment, plea, sentencing, and two *coram nobis* petitions, of which this is the second.  It began when the United States Attorneys Office for this District conducted an investigation into a major drug conspiracy whose objective was the importation of heroin and other narcotics from eastern Europe into the United States.   Mr. Asan, resident in this country, was one of numerous facilitators of that conspiracy, not an architect.  Having agreed to cooperate with the Government and plead to a lesser charge, and at considerable personal risk, Mr. Asan gave trial testimony material to the conviction of a number of principal conspirators.  When this Court sentenced Mr. Asan on his guilty plea in

Dated: New York, New York
      November 14, 2012

                                                    */s/Charles S. Haight, Jr.*
                                                    CHARLES S. HAIGHT, JR.
                                                    Senior United States District Judge

---

1984, the Government spoke with such force and eloquence about the nature, extent and importance of his cooperation that I sentenced him to three years' probation.

Mr. Asan completed his probation without adverse incident. He continued to live in the United States with his wife and children, leading from all indications a law-abiding and honorable life. In 2007, the Secretary decided to deport Mr. Asan to Macedonia, where a number of drug traffickers against whom he had testified, having served their sentences in this country, were now residing. That decision to deport was based solely upon Mr. Asan's guilty plea to the lesser narcotics charge in 1983, in compliance with his cooperation agreement. The Secretary decided to deport Mr. Asan after (and notwithstanding) his crucial cooperation with Government prosecutors in a major narcotics case, and after 23 years of law-abiding and productive life in this country as the head of a family. The United States Attorney, in fulfillment of the Government's promise in the cooperation agreement, wrote to officers in ICE, again describing, praising and emphasizing the value of Mr. Asan's cooperation with the Government in the underlying case. The Secretary, or those acting in her behalf, replied in substance to the United States Attorney: "We have your letter. It doesn't make any difference." This Court, rejecting the first *coram nobis* petition, held that the decision to deport rested with the Secretary and was not subject to judicial review. Mr. Asan was deported.

The Secretary has never sought to justify the agency's decision to deport Mr. Asan. That is not surprising, since no justification is discernible, given the circumstances of the case. However, the Secretary retains the power she can exercise now. Even amid the multiple demands and responsibilities of her vital office, this case presents an opportunity for the Secretary to pause, choose not to pass by on the other side of the road, and take the executive steps necessary to allow Mr. Asan to rejoin his family in the United States. With all due respect, this Court hopes that these words may come to the attention of the Secretary or other responsible officers in the Executive Branch, who will act upon them and thereby fulfill the hallowed maxim "Fiat justitia ruat coelum": "Let justice be done, though the heavens fall." If in the name of justice Mr. Asan is now permitted to return to this country and his family, there is no reason to suppose that the heavens would then fall, or (to focus upon the Secretary's particular responsibility) that the security of the Nation would be compromised.